Linda **LITTLEJOHN,**
**Plaintiff-Appellant,**

v.

**Jack ROSE, Individually and as Superintendent of the Calloway County Schools; and the Board of Education of Calloway County, Kentucky, Defendants-Appellees.**

No. 84–5063.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 8, 1985.

Decided July 16, 1985.

---

Jennifer B. Coffman, Brooks, Coffman & Fitzpatrick, Lexington, Ky., Joy L. Koletsky (argued), Nat. Educ. Ass'n, Washington, D.C., for plaintiff-appellant.

Thomas L. Osborne, Osborne, Deatherage & Fletcher, Paducah, Ky., Donald A. Jones (argued), Murray, Ky., for defendants-appellees.

Before KEITH, JONES and KRUPANSKY, Circuit Judges.

KEITH, Circuit Judge.

This is an appeal from a judgment by the United States District Court for the Western District of Kentucky granting appellees' motion for a directed verdict in this suit alleging violation of appellant's constitutional rights of privacy and liberty in contravention of 42 U.S.C. § 1983.[1] For

---

1. This statute, 42 U.S.C. § 1983, provides as follows:

§ 1983. **Civil action for deprivation of rights.**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen

the reasons stated below, we reverse the ruling of the district court.

## FACTS

Appellant Linda Littlejohn was a non-tenured teacher in the Calloway County school system. Appellant was originally hired as a substitute teacher and librarian, and held a teaching certificate that qualified her to teach all subjects in elementary grades 1 through 8. In the 1980–81 and 1981–82 school years, Littlejohn was employed as a full-time fifth grade teacher.

According to her principal, Bobby Allen, Littlejohn was an "excellent" teacher. She had good evaluations for the two years she taught. In addition to her teaching duties, she served on behalf of her school as chairperson for the Southern Association Accreditation and Kentucky Accreditation programs. According to Allen, these activities required "a lot of perseverance and a lot of ability to get along with others."

Under Kentucky law, non-tenured teachers are automatically rehired for the following school year unless they receive written notice to the contrary by April 30. The Calloway County School System could not definitely determine its hiring needs for the next school year by April 30. Therefore, in order to avoid automatic renewal, each April the Calloway County school system would notify the non-tenured teachers that their contracts would not be renewed. During the summer, the superintendent would recommend the appropriate number of non-tenured teachers for rehire.

In April 1982, Littlejohn and other non-tenured teachers received written notice that their contracts would not be renewed for the 1982–83 school year. Subsequently, Littlejohn and her husband of nine years separated, and were eventually divorced in July 1982.

During the summer of 1982, defendant Jack Rose, Superintendent of the Calloway County Schools, began making recommendations for the reemployment of the non-tenured teachers for the 1982–83 school year. Despite Principal Allen's decision to strongly recommend Littlejohn for rehire, Rose determined not to do so. Allen and School Board member Charles Red testified that Rose told them his determination was based upon Littlejohn's involvement in divorce proceedings. Because Rose failed to recommend her, Littlejohn was not rehired. Appellant subsequently initiated this action in federal district court.

Appellant contended that the failure of the superintendent to recommend the renewal of her teaching contract was based upon the status of her marital relationship, specifically, her impending divorce, in violation of her constitutional rights of privacy and liberty. The suit, based on 42 U.S.C. § 1983, sought reinstatement, back pay, and other damages and relief.

The district court acknowledged that "[t]here was evidence at the trial that the reason given by defendant for plaintiff's non-renewal was the fact that she was involved in the dissolution of her marriage." *Littlejohn v. Rose*, No. C82–0217–P(B), slip op. at 2 (W.D.Ky. Dec. 12, 1983). Nevertheless, the court directed a verdict in favor of the defendants. The court gave two reasons for its ruling. First, it said that "[p]laintiff cannot establish any fundamental right to employment by the Board, and, absent this right ... plaintiff has failed to sustain her burden." *Id.* at 3. Second, the court ruled that even assuming Littlejohn stated a viable constitutional claim, defendant Rose was entitled to qualified immunity because Littlejohn failed "to establish that defendant's actions were prompted by impermissible motivation or in disregard of plaintiff's clearly established rights." *Id.* The district court ruled that each reason alone would justify dismissal.

---

of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## DISCUSSION

### A.

**Decisions Regarding Appellant's Employment Based on Marital Status Violate Her Constitutional Right to Privacy:**

Ms. Littlejohn's tenure with the school system was too short to establish a property right in the absence of a contract, thus only the infringement on appellant's constitutional right to privacy will be addressed. Decisions of the Supreme Court have firmly established that "matters relating to marriage [and] family relationships" involve privacy rights that are constitutionally protected against unwarranted governmental interference. *E.g., Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). The Court has "routinely categorized [these matters] as among the personal decisions protected by the right to privacy [and, in addition] has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Zablocki v. Redhail,* 434 U.S. 374, 384–85, 98 S.Ct. 673, 680, 54 L.Ed.2d 618 (1978) (citing *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974); *see also Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965); *Carey v. Population Services International,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1971). The Supreme Court has established broad protection for matters relating to the marital relationship including the availability of due process in seeking adjustments to the marital relationship. *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). Given the "associational interests that surround the establishment and dissolution of [the marital] relationship", such "adjustments" as divorce and separation are naturally included within the umbrella of protection accorded to the right of privacy. *See Zablocki,* 434 U.S. at 385, 98 S.Ct. at 680; *U.S. v. Kras,* 409 U.S. 434, 444, 93 S.Ct. 631, 637, 34 L.Ed.2d 626 (1975). In *Carey v. Population Services International,* 431 U.S. at 684–85, 97 S.Ct. at 2015–16, the Supreme Court clearly held that decisions regarding marital status are protected by the constitutional right to privacy:

Although "[t]he Constitution does not explicitly mention any right of privacy," the Court has recognized that one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy." *Roe v. Wade,* 410 U.S. 113, 152 [93 S.Ct. 705, 726, 35 L.Ed.2d 147] (1973). This right of personal privacy includes "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600 [97 S.Ct. 869, 876, 51 L.Ed.2d 64] (1977). While the outer limits of this aspect of privacy have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions "relating to marriage," *Loving v. Virginia,* 388 U.S. 1, 12 [87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010] (1967); procreation, *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541–42 [62 S.Ct. 1110, 1113, 86 L.Ed. 1655] (1942); contraception, *Eisenstadt v. Baird,* 405 U.S. [438] at 453–454 [92 S.Ct. 1029 at 1038, 31 L.Ed.2d 349 (1972) ]; ... and family relationships. *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) ...

The district court acknowledged that matters relating to the marital relationship are entitled to special constitutional protection. *Littlejohn v. Rose,* No. C82–0217–P(B), slip op. at 3 (W.D.Ky. Dec. 12, 1983). Moreover, the Court observed that "[w]ere this an instance in which plaintiff had been discharged from her employment by reason of her domestic difficulties [the court] would have no hesitancy in holding that plaintiff had articulated a justiciable claim". *Id.* The court also stated that Littlejohn was not discharged from employment during the term of her contract, but

rather her one year employment contract was not renewed after it had expired, and thus plaintiff had no constitutionally protected property right to employment. For this reason the district court concluded that Littlejohn did "not establish a fundamental right to employment by the Board," and therefore she did not articulate a viable constitutional claim. *Id.* We do not agree.

■ The fundamental right violated here is Ms. Littlejohn's right to privacy regarding her marital status. After analyzing Supreme Court rulings, the district court concluded that the right to privacy is only recognized when certain fundamental rights such as liberty or property rights are also affected. *Littlejohn v. Rose,* No. C82–0217–P(B), slip opinion at 3 (W.D.Ky. Dec. 12, 1983) (citing *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976)); *Roe v. Wade,* 410 U.S. at 152–53, 93 S.Ct. at 726 (1973). The district court is incorrect. Upon closer examination it is clear that the ruling in *Paul v. Davis* did not constrain the holding in *Roe v. Wade. Roe* clearly established the existence of a constitutionally protected right to privacy which includes matters relating to procreation and marriage. As the Court stated in Paul:

> In *Roe* the Court pointed out that the personal rights found in this guarantee of personal privacy must be limited to those which are "fundamental" or "implicit in the concept of ordered liberty" as described in *Palko v. Connecticut,* 302 U.S. 319, 325 [58 S.Ct. 149, 152, 82 L.Ed. 288] (1937). The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protection—matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States' power to substantively regulate conduct.

424 U.S. at 713, 96 S.Ct. at 1166.

■ By focusing on whether Littlejohn had any right to employment, the district court missed the key inquiry of this case:

Whether the school board or Superintendent Rose could, without sufficient justification, deny public employment because of involvement in constitutionally protected activity. If the district court had so determined it would not have issued a directed verdict in appellees' favor.

The Supreme Court has generally rejected the theory that a government benefit, such as public employment, to which employees have no contractual right, may be denied for any reason. *Keyishian v. Board of Regents,* 385 U.S. 589, 605, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967). In 1972 the Court observed that its decisions:

> For at least a quarter century [have] made it clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.... For if the government could deny a benefit to a person because of his constitutionally protected [activities] his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which it could not command directly." [Citation omitted]. Such interference with constitutional rights is impermissible.

*Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). In *Perry,* the Court noted that it had applied this principle to a number of situations most often to those involving denials of public employment regardless of the public employee's contractual or other claim to a job. *Id.* (Citations omitted).

In the case at bar, allowing the board to refuse to renew a teaching contract because a teacher is undergoing divorce could possibly subject untenured teachers to painful consequences from the state board due to their marriage decisions. It is clear from the Supreme Court's analysis in *Perry* that a person's involvement in activity shielded by the constitutionally protected

rights of privacy and liberty constitutes an impermissible reason for denying employment. Even prior to *Perry*, this Circuit stated "it is no longer open to debate that [a non-tenured teacher] would be entitled to relief" if a Board of Education had based its refusal to rehire on a constitutionally impermissible reason. *Orr v. Trinter*, 444 F.2d 128, 134 (6th Cir.1971). Littlejohn's claim falls within the principles set forth above. She has presented evidence that she was denied employment because of her impending divorce.

■■■ The district court does not detail the evidence presented at trial. However, since the propriety of a ruling on a motion for directed verdict is the subject of review, this Court is free to review the evidence.[2] *Coffy v. Multi-County Narcotics Bureau*, 600 F.2d 570, 579 (6th Cir.1969); *Southern Railway Co. v. Miller*, 285 F.2d 202, 206 (6th Cir.1960). In a motion for directed verdict, the initial determination is whether the evidence is sufficient to create an issue of fact for the jury. This is solely a question of law to be determined by the trial court and subject to full review by this Court. *O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir.1975); 9 C. Wright & A. Miller, *Federal Practice and Procedure*, §§ 2521 at 537, 2524 at 541 (1971). The standard for determining whether a directed verdict was properly granted is very strict: View-

ing the evidence in the light most favorable to the party against whom the motion is made, a directed verdict is proper if reasonable minds could only come to a conclusion against the non-movant. In coming to this conclusion neither the credibility or weight of the evidence should be considered. *Patrick v. South Central Bell Telephone Co.*, 641 F.2d 1192, 1197 (6th Cir.1980); *Coffy v. Multi-County Narcotics Bureau*, 600 F.2d 570, 579 (6th Cir.1979); *Standard Alliance Industries v. Black Clawson Co.*, 587 F.2d 813, 823 (6th Cir.1978); *Morelock v. NCR Corp.*, 586 F.2d 1096, 1105 (6th Cir.1978); *O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir.1975).

■■■ In the instant case it is clear that the district court's grant of a directed verdict was incorrect. Viewing the record before us, it is clearly possible for a reasonable jury to find in favor of Ms. Littlejohn. The testimony below includes statements by appellant's superiors adequate to support the theory that her divorce was the motivating factor in the superintendent's refusal to recommend her for rehire. In direct testimony, Ms. Littlejohn's principal stated his positive opinion of her skills, then went on to detail a conversation with Superintendent Rose regarding appellant's reappointment:

Q. During the summer of 1982, did you have an occasion to have a conference

---

**2.** Federal Rule of Civil Procedure 50, which governs the granting of motions for a directed verdict, reads in pertinent part as follows:

**Rule 50. Motion for a Directed Verdict and for Judgment Notwithstanding the Verdict**

**(a) Motion for Directed Verdict: When Made; Effect.** A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts....

**(b) Motion for Judgment Notwithstanding the Verdict.** Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determina-

tion of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial.

with Superintendent Jack Rose concerning the employment of various teachers, including Linda Littlejohn?

A. Yes, I did.

Q. How did that come about, if you will, please?

A. I'm not for sure how the conference came about. I assume I was probably called in to the superintendent's office to discuss it with Doctor Rose.

Q. And did Linda Littlejohn come up?

A. Yes, she did.

Q. Can you recall how she came up?

A. Well, I think we were discussing personnel possibilities of openings at the school. At East Calloway we had, I think, two ladies in the first grade that was going to ask for a leave of absence due to pregnancy. We had a lady that was going to ask for an additional year's leave in second grade. And, of course, we had a gifted and talented position we had not filled at that point. We were discussing all those positions.

Q. Was it your desire and did you make any type of recommendation concerning Linda Littlejohn for her following year's employment?

A. Yes, I did. I recommended her back.

Q. All right. And did you have any conversation with Doctor Rose about that recommendation?

A. Yes. As I recall, Doctor Rose mentioned to me that he had gotten some phone calls, something about some lady in the community had called that was concerned about the divorcees. And we did have a couple or three divorcees in the East school. I don't think that's that uncommon, but we did have. And she expressed some concern about it, as well.

Q. All right. And what was his comment to you about the divorce?

A. Well, as nearly as I can recall now— this has been two years ago, but as near as I can recall, I asked him what the reason was for Linda's not being recommended back, and he stated to me that it was the divorce and the rumors of, you know, that was being circulated about the divorce, or whatever, or the phone call, I suppose, and the image that it would present in the community with the Eastwood Christian School being located in our community and we had some students from all three schools that had filtered over into the Eastwood Christian School. And that was of some concern to Dr. Rose, I think.

Q. All right. If you would, retrace for the jury so they can clearly understand how that conversation came about.

A. Well, we were talking about filling the position, and he just informed me— and it kind of caught me as a surprise— that he wasn't going to recommend Linda back. And I just said, "Well, why not?" And he stated to me then, "Because of the divorce, the phone call, and the image that we would present in the community."

Is that what you're asking?

Q. Yes, sir; yes sir. You had not brought up the topic of divorce prior to his mentioning it, is that true?

A. No, sir, not at that time.

Q. Were there any reasons given to you in response to your question why?

A. No, sir.

Jt.App. at 24–26.

In our view, Mr. Allen's testimony was sufficient to create an issue of fact for the jury. Further, under the Supreme Court's analysis in *Perry*, it is clear that the district court also mistakenly focused on whether Littlejohn had a right to employment, when the material question was whether or not the refusal to rehire her was based on her constitutionally protected decision to seek a divorce. Accordingly, we reverse the district court's grant of a directed verdict and remand the case for a new trial not inconsistent with the reasoning herein.[3]

---

**3.** In responding to appellees' motion for a directed verdict, it would have been better for the district court judge to submit the case to the jury. Had the jury returned a verdict for the appellant, the district court could have entered a judgment notwithstanding the verdict pursuant to Fed.R.Civ.P. 50(b) if it felt that Ms. Littlejohn had not made a case. On appeal, this Court

## B.

### The Qualified Immunity Defense Did Not Entitle Defendant Rose to Dismissal of the Complaint Against Him:

■ The district court also ruled that assuming Littlejohn's claim was viable, defendant Rose's right to qualified immunity in his individual capacity nevertheless justified the dismissal of the complaint in its entirety. In *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1973), the Supreme Court confronted the question of whether a school board member was immune from personal liability for damages when he had acted unconstitutionally in the suspension of a student. The qualified immunity that the Court established in *Wood* —and its progeny—insulated government officials from liability only in their individual capacities and only for money damages. It has no effect on their liability in their official capacities since actions against parties in their official capacities are, essentially, actions against the entities for which the officers are agents, *Brandon v. Holt*, — U.S. —, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Monell v. Department of Social Services*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978).

Although the district court cited *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) as a basis for its decision, the opinion itself suggests that the district court applied the objective test of *Harlow v. Fitzgerald*, 457 U.S. 800, 815– 819, 102 S.Ct. 2727, 2736–2738, 73 L.Ed.2d 396 (1982) as a basis for its decision that the defendant, Dr. Rose, individually, is entitled to the defense of qualified immunity. The district court found that "plaintiff's evidence in this case fails to establish that defendant's actions were prompted by impermissible motivation or in disregard of plaintiff's clearly established rights;" and that the court could not "impose upon the defendant the knowledge that his actions would violate any constitutional rights of plaintiff." *Littlejohn v. Rose*, No. C82–

could then dispose of the case without remanding for a totally new trial. *See Campbell v. Oliva*, 424 F.2d 1244, 1251–52 (6th Cir.1970);

0217–P(B), Slip opinion at 5 (W.D.Ky. Dec. 12, 1983). The district court's holding was in complete conformity with the objective standard announced in *Harlow v. Fitzgerald:* "we therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

■ Regardless of the standard applied, the qualified immunity defense only protects the superintendent in his individual capacity from money damages, not from other forms of relief sought such as reinstatement. *Id.* Further, despite the good faith intentions of the officers through which it acts, a local government entity cannot assert a good faith immunity defense in any circumstances. *Brandon v. Holt*, — U.S. —, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985); *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Accordingly, the availability of qualified immunity that would enable an individual defendant to escape individual liability for money damages would not warrant the dismissal of claims against that defendant in his official capacity or against a governmental entity.

■ The complaint in this case was filed against Rose "Individually and as Superintendent of the Calloway County Schools," and the "Board of Education of Calloway County, Kentucky." In addition to money damages, appellant seeks, among other things, an injunction reinstating her to a position as a classroom teacher in the Calloway County School System. Since, at most, the resolution of the qualified immunity issue would settle only defendant Rose's liability as an individual for money damages, these liability issues remain unresolved. Thus the dismissal of the entire case on the basis of defendant Rose's en-

9C. Wright & A. Miller, *Federal Practice and Procedure* § 2533 at 586.

titlement to qualified immunity was erroneous. Rose is only entitled to such immunity in his individual liability for money damages, not in his official capacity as the superintendent of schools. Thus the qualified immunity defense was an insufficient basis for a grant of summary judgment. Accordingly we also reverse the district court opinion on the grounds that appellees are not entitled to qualified immunity.