**Helen J. GUERCIO, Plaintiff–Appellee,**

v.

**George BRODY (88–2013) and John Feikens (89–1137), Defendants–Appellants.**

Nos. 88–2013, 89–1137.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 29, 1989.

Decided Aug. 13, 1990.

C. Nicholas Revelos, Grosse Pointe Farms, Mich., Thomas J. Mack (argued), Marya C. Young, Washington, D.C., for Helen J. Guercio.

Geneva S. Halliday, Asst. U.S. Atty., Detroit, Mich., Katherine S. Gruenheck, U.S. Dept. of Justice, Civ. Div. Appellate Staff, R. Joseph Sher, U.S. Dept. of Justice, E. Roy Hawkens (argued), Dept. of Justice, Civ. Div., Barbara L. Herwig, U.S. Dept. of Justice, Appellate Staff, Civ. Div., Washington, D.C., for George Brody.

James K. Robinson (argued), Jay E. Brant, Lee Brooks, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for John Feikens.

Before KRUPANSKY and WELLFORD, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

Defendants-appellants, George Brody (Brody) and John Feikens (Feikens) (collectively, appellants), appeal the denial of their motion to dismiss plaintiff-appellee Helen Guercio's (Guercio) complaint on the basis of qualified official immunity. The facts of this controversy were set out previously and the reader is referred to the circuit's previous opinion for a full rendition. *Guercio v. Brody*, 814 F.2d 1115 (6th Cir.1987) (*Guercio I*).

In summary, Guercio, who had been discharged from her position as confidential secretary to then Bankruptcy Judge Brody, commenced this action against him and District Judge Feikens, formerly Chief Judge of the United States District Court for the Eastern District of Michigan, for wrongful termination of her employment in alleged violation of her constitutional right to free speech. Guercio asserted a cause of action arising under *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and sought injunctive relief, declaratory relief, equitable relief, and monetary damages. Specifically,

Guercio prayed in her second amended complaint for a declaration that her termination was unconstitutional, for an injunction ordering her reinstatement to the same or a similar position, for backpay and accrued benefits up to $9,999.00,[1] and for damages in the amount of $1 million from Feikens and Brody jointly and severally in their individual capacities.

This circuit's opinion in *Guercio I* related the following factual scenario:

> The facts of this case, as alleged in the complaint and affidavits of record, lead us through an unfortunate chapter in the history of the U.S. Bankruptcy Court for the Eastern District of Michigan—a period in which Ms. Guercio asserts that she played a central role in exposing corruption in the Bankruptcy Court.
>
> According to the allegations, Guercio was hired in January 1979 by Judge Brody to serve as his secretary. From October 1979 through June 1981, Guercio made various disclosures concerning corruption in the Bankruptcy Court. She revealed, for example, that the Bankruptcy Court's system of random case assignments was being manipulated. These disclosures eventually led to the resignation of a bankruptcy judge as well as the criminal convictions of an attorney and bankruptcy court clerk.
>
> As part of this chain of events resulting from her disclosures, Guercio alleges that the Judicial Council of the Sixth Circuit intervened and placed the Bankruptcy Court in virtual receivership. The Judicial Council stated in an order dated May 6, 1981:
>
> > The Council concludes that the effective and expeditious administration of the business of the courts within this circuit requires that the administration of the Bankruptcy Court for the Eastern District of Michigan be placed under the supervision of the United States District Court for the Eastern District of Michigan. Such supervision should include the oversight of the general operation of the Bankruptcy Court Clerk's Office, the appointment of an Acting Clerk of the Bankruptcy Court and the approval of all personnel actions affecting employees of the Bankruptcy Court.
>
> By an order of May 18, 1981, the judges of the U.S. District Court for the Eastern District of Michigan directed Chief Judge Feikens to assume supervisory responsibility for the Bankruptcy Court pursuant to the earlier order of the Judicial Council of the Sixth Circuit.

*Guercio I,* 814 F.2d at 1116.

The record further discloses that the resignation of one of the bankruptcy judges who had been affected by the disclosures of corruption compelled the nomination of a replacement, and that George Woods (Woods) was nomiated to fill the position. Subsequent to the announcement of the Woods nomination, but prior to his confirmation, Guercio amassed and circulated "to the press and others" newspaper articles that had originally appeared approximately eleven years earlier in connection with Woods's 1969 nomination for United States Attorney for the Eastern District. *Id.* The newspaper articles apparently discussed Woods's purported legal representation of reputed organized crime figures during an earlier stage of his career. According to the complaint, Woods took umbrage with Guercio's disclosures and threatened Brody with withholding his "cooperation" should he be confirmed as a bankruptcy judge. Brody, in turn, reported his dilemma to Chief Judge Feikens, who, allegedly, instructed Brody to discharge Guercio.

The district court originally granted both judges absolute immunity from suit, reasoning that the decision to discharge Guer-

1. The United States District Courts have jurisdiction over claims against the United States for monetary relief of less than $10,000 pursuant to the Little Tucker Act, 28 U.S.C. § 1346(a)(2). Appeals from such actions, however, lie only in the Federal Circuit. 28 U.S.C. § 1295(a)(2); *United States v. Hohri,* 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). The *Federal Circuit* has determined that Guercio's second amended complaint *does not* state a claim under the Little Tucker Act. *Guercio v. Brody,* 884 F.2d 1372 (Fed.Cir.1989). Therefore, this court, and not the Federal Circuit, has jurisdiction over this appeal.

cio was undertaken in a judicial capacity. Another panel of this court reversed that determination in *Guercio I*, finding that Guercio's termination was in the nature of a ministerial or administrative act, as opposed to the type of judicial function traditionally accorded absolute immunity, *Guercio I*, 814 F.2d at 1119–20, and remanded the action to the district court, expressing no opinion as to the judges' entitlement to the protection of qualified immunity. *Id.* at 1120. Subsequently, the full court granted rehearing en banc to consider the question of absolute immunity insofar as it applied to Chief Judge Feikens. *Guercio v. Brody*, 823 F.2d 166 (6th Cir.1987). Prior to rehearing en banc, however, the Supreme Court announced its opinion in *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). In response to *Forrester*, this circuit vacated its order granting rehearing en banc, reinstated its previous mandate (rendered in *Guercio I*) relative to Judge Feikens, and remanded the entire matter to the district court in order to "consider the entire case in light of the Supreme Court's decision in *Forrester v. White* and consider the remaining issues in light of *Forrester v. White* and this court's reinstated decision of April 1, 1987." *Guercio v. Brody*, 859 F.2d 1232, 1233 (6th Cir.1988).

While the language of this last mandate would seem to suggest that the district court on remand was to reevaluate the propriety of granting *absolute* immunity in light of *Forrester v. White*, it is difficult to reconcile that suggestion with the court's "reinstatement" of its first opinion in *Guercio I*, which unequivocally denied the availability of absolute immunity for the act in question. The panel's decision in *Guercio I* is the law of this case, and both judges were, accordingly, foreclosed from asserting absolute judicial immunity as a defense against Guercio's charges in future proceedings.[2]

The sole remaining question, then, is whether the district court erred on remand in denying the judge's motions for dismissal, which motions were premised on a defense of qualified immunity. Resolution of this issue hinges entirely upon an accurate and comprehensive analysis of the qualified immunity test as it has been pronounced and applied in the opinions of the Supreme Court and this court, and application of that test to the facts of the case at bar as they are portrayed in Guercio's second amended complaint.

In the seminal case of *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court declared that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Ad hoc application of the *Harlow* test in the context of the facts of this particular case requires, at the threshold, examination of Guercio's complaint for a precise understanding of what she alleged to have occurred in the course of events leading to her discharge. Her complaint pleads a single cause of action summarized in paragraphs 24 and 31 as follows:

24. Defendants Feikens and Brody were motivated to effect and did effect plaintiff's termination solely because of her participation in exposing corruption in the Bankruptcy Court and her distribution of the 1969 newspaper articles critical of the nominee who was being considered to replace the judge whose corruption had been exposed by plaintiff. At all times relevant herein, defendants were aware of plaintiff's participation in exposing corruption in the court and of her distribution of articles relevant to the Woods nomination.

---

**2.** The possibility that this court desired the district court to reconsider the absolute immunity issue in light of *Forrester* is belied to a large degree by *Forrester*'s unequivocal holding that judges are not entitled to absolute immunity from suit for actions arising out of personnel decisions. *Forrester*, 484 U.S. at 229–30, 108 S.Ct. at 545–46. Thus, although the language of the court's mandate in *Guercio I* is unclear, further consideration of absolute immunity is foreclosed by the *Forrester* rationale.

31. By denying plaintiff her rights under the First Amendment to speak on matters of public concern, defendants Feikens and Brody deprived plaintiff of her rights and privileges secured by the Constitution. . . .

In sum, in her single cause of action Guercio recited a continuous course of conduct commenced in December of 1979, ultimately resulting in her discharge in October of 1981. Guercio's activities as Judge Brody's secretary and as a disseminator of matters of ostensible public interest are best viewed on a continuum, starting with her initial employment in 1979, her disclosures about corruption in the bankruptcy court, and concluding with her circulation of the 1969 newspaper accounts as a commentary on Woods's fitness for the office to which he had been nominated.

The motion to dismiss invoking the doctrine of qualified immunity filed by Judge Feikens because his "conduct did not violate any right so clearly established that all reasonable [Judges] would know they were under an affirmative duty to refrain from such conduct" joins issues of law to be decided by the court exclusively upon the allegations incorporated into the complaint, which must, for purposes of considering the motion to dismiss, be accepted as true. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 174–75, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965); *Collins v. Nagle,* 892 F.2d 489, 493 (6th Cir.1989). "The question of whether qualified immunity attaches to an official's actions is a purely legal question for the trial judge to determine prior to trial." *Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988); *see also Ramirez v. Webb,* 835 F.2d 1153, 1156 (6th Cir.1987); *Dominque v. Telb,* 831 F.2d 673, 677 (6th Cir.1987); *Donta v. Hooper,* 774 F.2d 716, 719 (6th Cir.1985), *cert. denied,* 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 760 (1987).

Thus, the question confronting this court, simply stated, is not whether Judge Feikens actually violated Guercio's first amendment right of free speech—an issue of fact reserved for the jury—but, rather, is whether plaintiff's rights were so clearly established when she was terminated that Judge Feikens should have understood that his conduct at the time he ordered her discharge violated her first amendment right to free speech—a question of law to be decided by the court. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Garvie v. Jackson,* 845 F.2d at 649; *Ramirez v. Webb,* 835 F.2d at 1156.

In the case at bar, the district court was, without question, correct in concluding that the right that Guercio alleged Feikens to have infringed was, *in the abstract,* clearly established in 1981 under the Supreme Court's decision in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1967). The teachings of *Pickering* charted the course for a determination of Judge Feikens's entitlement to the shield of qualified immunity. In that decision, the Supreme Court instructed that a public employee's interest in commenting on matters of public concern is protected by the first amendment only insofar as it is of greater weight than the employer's interest in "promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1735. Under this familiar rule of balance, the employee's rights to free speech are qualified by the countervailing interests of his employer. When a *Pickering* claim is adjudicated on its merits, it is for the fact-finder, be it jury or court, to determine the relative weight of these potentially antithetical interests. In the qualified immunity context, by contrast, it is the responsibility of the court to determine if the law was so clearly established at the time of the incident that a reasonably competent public official should have known that a course of action would be inconsistent with a public employee's rights as defined in *Pickering.*

Accordingly, having in the first instance properly defined the "clearly established by law" inquiry, this court must, in disposing of a qualified immunity motion, place the totality of the well-pleaded, non-conclusory allegations of the complaint on the *Pickering* scale to balance a public employee's

interest in commenting on matters of public concern against the employer's interest in "promoting the efficiency of the public services it performs through its employees," *id.*, at 568, 88 S.Ct. at 1735. Without concluding where that balance ultimately comes to rest—a decision reserved for the trier of fact—this court must dispose of the motion to dismiss on the basis of qualified immunity pursuant to the dictates of *Harlow, Malley, Anderson, Garvie, etc.*, by determining whether *Guercio's* rights under *Pickering*, as opposed to whether the general teachings of *Pickering*, were so clear at the time in question that reasonable minds could not differ on the constitutionality of her discharge.

Writing upon a clean slate, then, the predicate issue to be decided by this appeal is whether Guercio's first amendment rights to free speech were so evident from pre-existing law (*viz., Pickering* ) when she was ordered discharged by Judge Feikens that, measured objectively, he was under an affirmative duty to refrain from such conduct. *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738; *Anderson v. Creighton*, 107 S.Ct. at 3038; *Ohio Civil Service Employees' Ass'n v. Seiter*, 858 F.2d 1171, 1173 (6th Cir.1988). This approach is distinct from that followed by the district court, which mischaracterized the qualified immunity inquiry as one requiring it "to determine whether the allegations in the Plaintiff's complaint clearly violated established law at the time that the incidents took place." Similarly reflective of the erroneous approach to the issue was the court's remark that "the ... *Pickering* balancing test ... [was] clearly established law at the time of Ms. Guercio's firing." As hereinafter discussed, the inquiry as framed by the district court was so abstract that its consideration of the motion to dismiss failed to apply the qualified immunity test *to the facts and circumstances of this case.* In sum, the district court's approach failed to apply the *Harlow* test, which in the first instance required a determination of whether a clearly established right was alleged to have been violated, and, secondly, a determination of whether a reasonable public official should

have known that the conduct at issue was undertaken in violation of that right. As a consequence of its misdirection, the district court erroneously decided the defendant's qualified immunity motion to dismiss without applying the test that had been mandated by the Supreme Court and this circuit in *Harlow v. Fitzgerald, supra; Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Anderson v. Creighton, supra; Dominque v. Telb, supra; Ramirez v. Webb, supra;* and *Garvie v. Jackson, supra.*

*Garvie v. Jackson* (a *Pickering* case of striking similarity) clearly counsels the application of a fact-specific, as opposed to abstract, approach to qualified immunity questions:

We should focus on whether, at the time defendants acted, the rights asserted were clearly established by decisions of the Supreme Court or the courts of this federal circuit. Cf. *Davis v. Scherer*, 468 U.S. [183] at 192, 104 S.Ct. [3012] at 3018 [82 L.Ed.2d 139 (1984) ]; *Davis v. Holly*, 835 F.2d 1175, 1182 (6th Cir.1987). "[Defendants] have qualified immunity unless plaintiffs' 'rights were so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.' " *Ramirez v. Webb*, 835 F.2d at 1156 (quoting *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir.1987)). It is not determinative that the plaintiff has asserted the violation of a broadly stated general right:

[O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant sense: *The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.* This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of

preexisting law the unlawfulness must be apparent.

*Anderson*, 107 S.Ct. at 3039 (citation omitted) [emphasis added]; *see also Malley*, 475 U.S. at 341, 106 S.Ct. at 1096 (if officers of reasonable competence could disagree on an issue, immunity should be recognized).

\* \* \* \* \* \*

In arguing against defendants' claim of qualified immunity, Garvie asserts that a reasonably competent public official would have known in 1986 that an alleged retaliatory termination of a department head based on the exercise of first amendment rights was unlawful. *We believe that under the reasoning of Anderson, however, Garvie's argument presents too general a question. Instead, we consider whether reasonably competent officials could have disagreed on whether and to what extent Garvie's speech was protected by the first amendment.*

*Garvie v. Jackson*, 845 F.2d at 649–50 (emphasis added). *See also Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.) (en banc), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988) (" 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted' ") (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir.1987)); *Green v. Carlson*, 826 F.2d 647, 649 (7th Cir.1987) (district court framed too general a question in examining abstract existence of clearly established constitutional right without considering "the specific facts of this case").

The standard to be applied in resolving the "clearly established law" predicate within the *Harlow* touchstone of "objective legal reasonableness" is defined in *Malley v. Briggs* with clarity: *"if officers of reasonable competence could disagree on this issue, immunity should be recognized."* 475 U.S. at 341, 106 S.Ct. at 1096 (emphasis added). The qualified immunity test thus is not as stringent as the district court's disposition would imply, affording as it does "ample protection to all but the

plainly incompetent or those who knowingly violate the law." *Id.*

In light of *Pickering*, and mindful of the appropriate qualified immunity test as defined in *Harlow*, this court must decide from the continuous course of Guercio's conduct between December, 1979 and October, 1981, when she was discharged as recited in the complaint, if judges of reasonable competence in the position of Judge Feikens at the time here in issue could have disagreed upon whether her right to exercise her first amendment right to free speech without being terminated from her employment was outweighed by the public interest in restoring morale, cooperation, dignity, public respect, and confidence to the United States Bankruptcy Court for the Eastern District of Michigan, a court which had been corroded by corruption and favoritism.

In considering, pursuant to the mandate of *Pickering*, Guercio's asserted first amendment rights to speak on matters of public interest without jeopardy to her employment against any disruption that may have been caused by her disclosures of corruption in the bankruptcy court and in her circulation of the dated news accounts critical of Woods, this court should recollect the interdependent working relationship that existed between the bankruptcy and district courts and the judges thereof during 1981 when plaintiff's discharge occurred. Prior to the 1984 amendments to the Bankruptcy Code, bankruptcy judges were appointed by district court judges, and they served in a capacity "adjunct" to the district court. *See Northern Pipeline Construction v. Marathon Pipe Line Co.*, 458 U.S. 50, 76–87, 102 S.Ct. 2858, 2874–80, 73 L.Ed.2d 598 (1982). The relationship was substantially changed in 1984 when the appointment of bankruptcy judges became the prerogative of the various circuit courts. *See* 28 U.S.C. § 152. The 1984 revisions to the Bankruptcy Code, although perpetuating the bankruptcy courts as functional adjuncts to the district courts, clarified and elevated jurisdictional distinctions between the courts, leaving the bankruptcy courts and judges in a more insular

position than they had occupied previously. *See* 28 U.S.C. § 157.

Mindful of this historical condition, which was common to bankruptcy courts throughout the United States, and also mindful of the more particularized circumstances arising out of Judge Feikens's specially delegated responsibility pursuant to the mandate of the Sixth Circuit Judicial Council to restore morale, cooperation, public confidence, and efficient operation in the bankruptcy court, it is apparent that the potential for internecine conflict in the court was palpable and, moreover, that Judge Feikens's desire to prevent such conflict was both genuine and compelling.[3] Concerns for inter-chamber harmony, cooperation, and collegiality between judges and court personnel—judicially noticed by this court—were in all probability central and indispensable to the efforts of Chief Judge Feikens to implement the Sixth Circuit's mandate.

It is within this factual backdrop that the allegations of Guercio's second amended complaint that are material to the resolution of defendants' motion to dismiss invoking the defense of qualified immunity must be considered. These pertinent assertions appear in paragraphs 8 through 17 and paragraph 27 of the complaint, wherein Guercio relates her activities in disclosing corruption within the bankruptcy court, and paragraphs 18 through 26, wherein she recounts her activities in circulating the dated news accounts critical of bankruptcy judge designee Woods.

Accepting as true the nonconclusory allegations incorporated in these relevant sections of her complaint, it appears that Guercio's initiative—launched in 1979—became, over a period of time, productive in notifying the District Court for the Eastern District of Michigan of improprieties that implicated both unethical and criminal conduct within the Detroit Bankruptcy Court. Although both Judge Feikens and the Administrative Office of the United States Courts (AO) initially withheld formal action

on Guercio's original submissions, it appears from her pleadings that during the ensuing eleven months, plaintiff developed additional substantive factual proof to support her disclosures of irregularity in the Detroit Bankruptcy Court, which in turn prompted Judge Feikens to request the AO to investigate the situation. The investigation, which Judge Feikens requested and endorsed, and in which he actively participated along with the plaintiff and other authorities within the limits of his office, ultimately resulted in the resignations of Bankruptcy Judge Harry Hackett, Chief Clerk of the Bankruptcy Court William Harper, and Deputy Clerk Kathy Bagoff sometime around June 24, 1981.

As detailed above, a concerned Judicial Council of the Sixth Circuit intervened and placed the Bankruptcy Court into virtual receivership by an order dated May 6, 1981, the oversight of which mandate was delegated to Judge Feikens on May 18, 1981. The mandate was directed primarily at rehabilitating the court, and expressly conferred upon Judge Feikens (as sub-delegatee) responsibility for approving *"all personnel actions affecting employees of the Bankruptcy Court."* *Guercio I,* 814 F.2d at 1116 (quoting Judicial Council mandate) (emphasis added).

For approximately twenty months, as the Bankruptcy Court investigation proceeded, plaintiff was neither admonished for nor discouraged from pursuing her activities, and she continued secure and free from threat to her employment. Under the circumstances, during this critical phase of the investigation and up to the point at which Guercio circulated the dated news articles critical of Woods, judges of reasonable competence could not but have believed that Guercio's job security was protected by the first amendment as interpreted in *Pickering.* However, in reaching a final disposition of the defendant's motion to dismiss, Guercio's disclosure of irregularities in the bankruptcy court must be considered *along* with her circulation of the

---

**3.** At the time of Guercio's discharge, Chief Judge Feikens had been implementing the special delegation of responsibility to restore morale, co-

operation, public confidence, and efficient operation in the bankruptcy court for approximately five months.

dated newspaper articles—that is, along the entire continuum of her conduct over an extended period of time, encompassing the totality of her activities as alleged in her complaint.[4]

The more pertinent allegations of the second amended complaint that bear upon the balance between Guercio's right to exercise her first amendment rights and the public interest in restoring morale, cooperation, public respect and confidence to the Bankruptcy Court for the Eastern District of Michigan—which effort was, at least until July or August of 1981, from the pleaded facts, progressing expeditiously and effectively—are pleaded in the following paragraphs of the second amended complaint:

  17. Shortly after Hackett resigned, a committee of federal district court judges nominated attorney George E. Woods to replace Hackett as a Bankruptcy Judge. A three-attorney screening committee of Michigan attorneys approved the judges' nomination of Woods. Woods' nomination generated much public controversy, was widely criticized and defended, and was the subject of extensive media coverage.

  19. In the summer of 1981, plaintiff discovered old newspaper articles describing the controversy over Woods' 1969 nomination for U.S. Attorney and its subsequent withdrawal. Plaintiff informed defendant Brody about the newspaper articles she had discovered regarding Woods and that she intended to distribute the articles to, among others, the committee considering Woods for the Bankruptcy Court judgeship. . . .

  20. Plaintiff sent copies of the 1969 newspaper articles she had discovered concerning nominee Woods to the FBI, the AO, the judges' nominating committee, the United States Attorney's Office, and various newspaper reporters.

  21. Woods informed defendant Brody that, because plaintiff had distributed the 1969 newspaper articles, Woods would, if appointed, refuse to work with defendant Brody unless plaintiff's employment were terminated. Defendant Brody thereupon discussed with defendant Feikens the demand by Woods that plaintiff be fired.

  23. Upon information and belief, Judge Feikens demanded that Judge Brody terminate plaintiff's employment in light of the above disclosures concerning Woods. On October 16, 1981, Judge Brody did terminate plaintiff's employment.

  24. Defendants Feikens and Brody were motivated to effect and did effect plaintiff's termination solely because of her participation in exposing corruption in the Bankruptcy Court and her distribution of the 1969 newspaper articles critical of the nominee who was being considered to replace the judge whose corruption had been exposed by plaintiff. . . .

  27. The disruption in the Bankruptcy Court workplace, if any, that may have resulted from plaintiff's disclosures regarding the manipulation of the random assignment system and other disclosures of illegal activity, was minor, and such disruption, if any, was in fact caused only by those associated with or sympathetic to the persons whose illegal activities plaintiff had participated in exposing.

The nonconclusory allegations of paragraphs 17 through 27 of the second amended complaint recite that the dated news accounts critical of Woods were circulated after a committee of federal district judges

---

4. This case does not implicate the rule pronounced by the Supreme Court in *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Under *Mt. Healthy,* an employee may not successfully challenge her discharge if one of two asserted reasons for the termination—one constitutional and the other not—would, standing alone, have been sufficient to bring about the employer's decision. This case does not present a "dual motive" situation; according to Guercio's complaint, she was fired in response to a continuing course of conduct, and not *solely* as a result of her bankruptcy court disclosures or *solely* as a result of her distribution of the old newspaper articles critical of Woods.

of the Eastern District of Michigan had nominated him to replace Hackett as a bankruptcy judge, after his background and qualifications had been investigated, and after his nomination had been endorsed by a screening committee of three Michigan attorneys. In sum, the nominative and appointive procedures, including the required investigations, had been exhausted to completion when Guercio released the dated news accounts, which had been of public record for approximately eleven years. The circulation was not accompanied by any newly discovered disclosures of concealed past or current misdeeds or wrongdoing relative to the substance of the circulated news accounts critical of Woods. Guercio did not attest to the truthfulness or accuracy of the circulated news accounts nor did she directly express an opinion as to the integrity, honesty, ability, or other qualifications of Woods to serve as a bankruptcy judge.

Mindful of the disruptive implications of the turmoil within the Detroit Division of the Bankruptcy Court together with the Sixth Circuit Judicial Council's delegated mandate to restore the public confidence and efficient operation of the court by, among other actions, expeditiously appointing a judge to the vacancy created by the resignation of Judge Hackett; of the disharmony precipitated by Guercio's distribution of dated news articles, which disharmony Guercio has conceded affected to some degree the operation of the Bankruptcy Court, at least among personnel sympathetic to those individuals whose activities she had exposed; and of the incipient confrontation manifested by the bitter resentment Woods displayed when he advised Judge Brody that he would, if appointed, refuse to work with Brody unless Guercio's

employment were terminated, a competent judge in the position of Judge Feikens could have reasonably:

1. questioned if the circulation of the dated news accounts constituted an expression of speech protected by the first amendment;

2. concluded that plaintiff's expressions and activities concerning Woods served to frustrate the implementation of the Sixth Circuit Judicial Council's delegated mandate to restore the public confidence in the Detroit Bankruptcy court because they discredited and embarrassed the appointive procedure and raised the genuine spectre of conflict between judges of the court;

3. concluded that Guercio's expression and activities had become a force counterproductive and disruptive to the ongoing effort to rehabilitate and revitalize the operation of the Detroit Bankruptcy Court; [5] and

4. concluded that Guercio was no longer speaking out on matters of public interest, but rather had begun to speak as an employee on matters primarily of personal concern.

In considering Guercio's recitation of her continuous course of conduct as incorporated into her complaint, but before proceeding to a final resolution of the qualified immunity motion to dismiss within the confines of her pleadings, this court emphasizes that its disposition is not anchored in any single doctrinal point heretofore discussed, which, standing alone, would enable the appellants to prevail. Rather, the decision is rooted in the cumulative effects of the points discussed, together with an informed assessment of the general state

---

5. Conclusions (2) and (3) were especially reasonable in light of Justice Powell's admonition that

> the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster

disharmony, and ultimately impair the efficiency of an office or agency.

*Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (quoted with approval in *Connick v. Myers,* 461 U.S. 138, 151, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983)). As noted in *Connick,* it is a "common-sense realization that government offices could not function if every employment decision became a constitutional matter." 461 U.S. at 143, 103 S.Ct. at 1688.

of the law, all in the context of an inquiry that necessarily focuses on the objective reasonableness of an official's act when viewed in light of all properly pleaded facts.

Accordingly, accepting as true the totality of Guercio's allegations reciting a course of continuous conduct and events for the period from December, 1979, through the summer of 1981, this court must balance on the *Pickering* scale—without deciding where the balance will ultimately come to rest (a question of fact reserved for the jury)—Guercio's right to freely express herself as a citizen upon matters of public interest against the Bankruptcy Court's interest, as effectuated through Judge Feikens, in promoting the efficiency of the public services it performs through its employees. *See Pickering,* 391 U.S. at 568, 88 S.Ct. at 1735.

*Malley* and its progeny, including *Garvie, Dominque,* and *Ramirez* in this circuit, mandate that if judges of reasonable competence in the position of Judge Feikens at the time of Guercio's termination, measured objectively, could have disagreed as to where the *Pickering* balance would ultimately come to rest, the protection of qualified immunity should be granted. In this court's considered opinion, accepting the totality of plaintiff's well-pleaded allegations as true, judges of reasonable competence in the position of Judge Feikens at the time here in controversy, measured objectively, could have disagreed as to:

1. whether and to what extent Guercio's speech was on a matter of public concern, entitling her to claim the

protection of the first amendment; and

2. where the *Pickering* scale, with all of the parties' competing interests in the balance, would ultimately come to rest.

Consequently, for the reasons herein, it is the court's judgment that Guercio's right to protection under the first amendment was not so clearly established at the time that Feikens ordered her termination that any judge of reasonable competence in the position of Judge Feikens, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.

For these reasons, both Judge Feikins and Judge Brody [6] are entitled to the protection of qualified immunity. The district court's dispositions are therefore reversed and the cases are remanded with instructions to vacate the judgments below and dismiss the plaintiff's causes of action insofar as they seek the recovery of monetary damages from Brody and Feikens in their individual capacities.[7] Existing precedent within this circuit, however, dictates that the defense of qualified immunity protects officials only from suit for *monetary damages. Hensley v. Wilson,* 850 F.2d 269, 273 (6th Cir.1988); *Littlejohn v. Rose,* 768 F.2d 765, 772 (6th Cir.1985), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1260, 89 L.Ed.2d 570 (1986). "An official is not entitled to immunity from actions seeking only injunctive or declaratory relief." *Spruytte v. Walters,* 753 F.2d 498, 510 (6th Cir.1985), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 788, 88 L.Ed.2d 767 (1986).

---

**6.** The qualified immunity question must be approached from the perspective of Judge Feikens, only, because it is clearly alleged that Brody terminated Guercio only upon direction from Feikens, and not for independent reasons or on his own initiative. Having concluded that Feikens is entitled to immunity, then Brody, too, benefits from that determination.

**7.** A court may properly dispose of a case for reasons of qualified immunity on a motion to dismiss on the pleadings, without discovery or the filing of a motion for summary judgment. "[A] defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth,* 472 U.S. 511,

526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). A "defendant could properly challenge the sufficiency of the complaint under F.R.C.P. 12(b)(6) on the basis that he was entitled to qualified immunity *because the facts pleaded* would not show that his conduct violated clearly established law of which a reasonable person would have known at the time." *Dominque v. Telb,* 831 F.2d at 677 (emphasis added). *See Kennedy v. City of Cleveland,* 797 F.2d 297, 299 (6th Cir.1986) (failure to plead violation of a clearly established right of which a reasonable official would have known "precludes plaintiff from proceeding further, even from engaging in discovery....").

In light of the policy underlying the doctrine of qualified immunity, it is worth noting that the rule excepting equitable claims from a defense of a qualified immunity assumes dubious validity if applied without particularized concern for individual cases. In *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court noted that "the 'consequences' with which [it was] concerned in *Harlow are not limited to liability for money damages....*" *Id.* at 526, 105 S.Ct. at 2815 (emphasis added). Rather, in formulating the qualified immunity doctrine, the Court was primarily concerned with preventing the distraction of public officials from the performance of their discretionary governmental duties by shielding them " 'from the risks of *trial....*' " *Id.* (quoting *Harlow*, 457 U.S. at 816, 102 S.Ct. at 2737) (emphasis added). The Sixth Circuit's rule excepting equitable claims from the defense of qualified immunity is predicated on the notion that "actions against parties in their official capacities are, essentially, actions against the entities for which the officers are agents." *Littlejohn v. Rose*, 768 F.2d at 772. Insofar as this approach to equitable claims does not place public officials at the peril of defending actions for which they have been held immune from personal liability, there is no genuine conflict with the quoted language from *Mitchell v. Forsyth.*

It is difficult, however, to discern precisely which governmental "entity" will assume the burden of defending against Guercio's equitable claims on remand.[8] Thus, in this case it is by no means clear that dismissal of all but the equitable claims will fully serve the purpose for which qualified immunity is granted under *Harlow*. The cited Sixth Circuit cases reflect no limiting principle with respect to when it is (or is not) appropriate to exclude

equitable claims from the coverage of an otherwise valid defense of qualified immunity, and this panel must accept and apply the dictates of this circuit's enunciated precedents. For this reason, Guercio's remaining equitable claims asserted against the appropriate governmental entity—the request for a declaratory judgment, for a mandatory injunction ordering Guercio's reinstatement to the same or a similar position to which she held at the time of her discharge, and for backpay and benefits up to $9,999.00 [9]—must be remanded to the district court for additional consideration, notwithstanding appellants' entitlement to qualified immunity from the claim for money damages. This court further notes, however, that it appears unlikely that Guercio may recover all of the equitable relief that she requests in her complaint. Specifically, the authority of the district court to order Guercio reinstated to "her former position or an equivalent position" is subject to question. First, this court takes notice of the fact that Bankruptcy Judge Brody has retired from the court, and consequently Guercio's secretarial position no longer exists. Second, the availability of "equivalent positions" is debatable and this court doubts that a judge of the bankruptcy court may be ordered to employ a confidential secretary not of his or her personal selection.

Accordingly, the judgment of the district court denying appellants' *motion to dismiss* is REVERSED and the case is REMANDED to the district court for adjudication of Guercio's remaining equitable claims for relief.

WELLFORD, Circuit Judge, concurring in part and dissenting in part:

I am most reluctant to dissent from the thoughtful opinion in this very difficult

---

8. As noted by the Federal Circuit in its disposition of the Little Tucker Act jurisdictional question, *see supra* note 1, Guercio was "an employee of the court to which she was appointed" and not of any discernible governmental agency. *Guercio v. Brody*, 884 F.2d at 1374.

9. As explained *supra* at note 1, Guercio limited her claim for backpay and benefits to $9,999.00 so as to preserve the jurisdiction of the district court over what she presumed to be a claim

brought under the Little Tucker Act. In concluding that Guercio had *not* stated a claim under the Little Tucker Act, the Federal Circuit was unable to discover any "statutory or regulatory authority that it might entitle a person in Guercio's position to an award of back pay...." *Guercio v. Brody*, 884 F.2d at 1374. Therefore, among Guercio's burdens on remand will be to prove the existence of a valid cause of action for backpay.

case. Had a motion for summary judgment been filed in this case by defendants rather than a motion to dismiss, I am persuaded that application of the balancing test under *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1967), would have presented a less complex problem to solve.

Persons standing in the position of defendants, asserting qualified or good faith immunity, could reasonably view plaintiff's actions as bringing about disharmony, recrimination, and continued turmoil in that court, which was in virtual receivership, with Judge Feikens named as an effectual receiver. 28 U.S.C. § 332(d)(2), dealing with the formation and operation of circuit judicial councils, directs that "[a]ll judicial officers and employees of the circuit shall promptly carry into effect all orders of the circuit council." Judge Feikens was placed with ultimate "supervisory responsibility and oversight" and directed to restore that court's harmonious, efficient and effective operations. *See Guercio I.*

*Pickering* stands for the essential proposition that a public employee (in that case a public school teacher) could not be compelled by threat of discharge to relinquish first amendment rights of public criticism of the public employer (the school board). At the same time, the Supreme Court recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568, 88 S.Ct. at 1734. The Court proceeded to state the problem in such a case: "to arrive at a balance between the interests of the teacher ... and the interest of the State, as an employer, in promoting the efficiency of the public services it performs...." *Id.* at 568, 88 S.Ct. at 1734–35. Because *Pickering*'s general public criticism of policies was "*in no way directed towards any person* with whom appellant [Pickering] would *normally be in contact* in the course of his daily work as a teacher," there was therefore "no question of maintaining either discipline by immediate superiors or *harmony among coworkers....*" *Id.* at 569–70, 88 S.Ct. at 1735

(emphasis added). While *Pickering* would cause defendants to be aware that plaintiff retained her first amendment right to criticize publicly the general policies of her employer, they were obviously aware that the conduct in question was directed toward Woods, who was to be a vital cog in the bankruptcy court operation, and her conduct in circulating old newspaper articles critical of Woods threatened the harmonious and effective relations necessary to bring about the expeditious administration of business and justice in the bankruptcy court.

The problem here which I cannot escape, and the reason for my dissent in part, is that the motion to dismiss requires us to take as true conclusory allegations in the amended complaint that may be inconsistent with other factual predicates in the complaint and with the historical record of what actually happened in the bankruptcy court based on Guercio's whistleblowing and responses of others who brought about the resignations of a bankruptcy judge, the clerk, and a deputy clerk. Guercio says in her complaint that she instituted charges about corruption over a twenty-month period, and no action whatever was taken to threaten her position as confidential secretary during all this time. It would seem that only after her later distribution of old newspaper accounts about Woods and the latter's reaction was there any motivation or purpose to bring about her termination. She concedes that Judge Feikens gave approval for a thorough investigation a year before her discharge, knowing of her role as a whistleblower. Yet plaintiff asserts (paragraph 24) that "*solely* because of her participation in exposing corruption in the Bankruptcy Court *and* her distribution of the 1969 articles," she was discharged (emphasis added).

If we were considering the issue based on a motion for summary judgment, a balancing of the important public interests of preserving harmony and avoiding discord in a shattered court against an employee's first amendment right to distribute stale information directed towards an important figure on that court might well result in a

finding for defendants based on qualified immunity and on the *Pickering* balancing test. We cannot, however, properly take that step, despite my colleague's persuasive analysis in the majority opinion, because we are dealing with a Rule 12(b)(6) motion. I recognize, of course, that a summary judgment motion would engender proof beyond the complaint and I make no prejudgment with respect to the ultimate ruling on a summary judgment motion based on qualified immunity.

Regretfully, I cannot agree with two propositions in the majority's analysis:

(1) "a competent judge in the position of Judge Feikens could have reasonably questioned if the circulation of the dated news accounts constituted an expression of speech protected by the first amendment," and

(2) defendants could reasonably have concluded that "Guercio was no longer speaking out on matters of public interest, but rather ... on matters primarily of personal concern."

*Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1982), gives us guidance in this latter regard, but the content and nature of Guercio's expressions differ materially from those of Myers, who was found to be looking out to preserve her own personal interests rather than to engage in discussion of matters of public interest. *Connick* puts the matter in proper perspective:

> The repeated emphasis in *Pickering* on the right of a public employee "as a citizen, in commenting upon matters of public concern," was not accidental. This language, reiterated in all of *Pickering*'s progeny, reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government officers could not function if every employment decision became a constitutional matter.

*Connick v. Myers*, 461 U.S. at 143, 103 S.Ct. at 1688 (footnotes omitted).

I am in agreement with the majority analysis concerning the procedural posture and background of this controversy. I also concur in the conclusion concerning the re-mand to the district court with respect to the equitable claims made by Guercio.

I dissent on the reversal of the district court order on the damages aspect of plaintiff's complaint.